FILED
U.S. BANKRUPTCY COURT
EST & WST DISTS. OF ARK.

OCT - 3 2006

JEAN ROLFS, CLERK
_____
DEP. CLERK

IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

IN RE: JAMES AND LINDA MORGAN,   CASE NO. 5:03-bk-12580M
                                 (CHAPTER 13)

JAMES AND LINDA MORGAN                              PLAINTIFFS

VS.                    AP NO. 5:05-ap-1244

JO-ANN GOLDMAN, CHAPTER 13 TRUSTEE;
BANK OF AMERICA; ET AL.                             DEFENDANTS

MEMORANDUM OPINION

On August 30, 2005, James and Linda Morgan ("Debtors") filed the above-captioned adversary proceeding against Jo-Ann Goldman, Chapter 13 Trustee ("Trustee"), and nine unsecured creditors in the Chapter 13 case.

The complaint alleges that the Trustee, acting pursuant to her duties, improperly disbursed $19,150.37 pro rata to the named unsecured creditors contrary to the terms of the confirmed Chapter 13 plan. The complaint further states that payment of $19,150.37 should have been made to Dewitt Bank & Trust Company, which holds a claim secured by the Debtors' personal residence. The complaint alleges that general unsecured creditors should not have received disbursements until administrative, secured, priority, child support, and special non-priority unsecured creditors were paid in full.

In their complaint, the Debtors prayed for turnover of said funds from the unsecured

1

creditors and in the alternative prayed for judgment against the Trustee in a sum sufficient to compensate the Debtors for damages proximately caused by the Trustee's action, together with costs and attorney's fees.

The Trustee filed a timely answer admitting that she had distributed $20,056.03 to unsecured creditors pursuant to the terms of the Debtors' confirmed plan "which proposed that all disposable income received by the Debtors within the first 36 months of the plan would be paid for the benefit of unsecured creditors." (Answer to Complaint for Turnover at 2.) She alleged the distribution was proper and prayed that the complaint be dismissed.

Trial on the merits was held in Pine Bluff, Arkansas, on May 10, 2006, and the matter was taken under advisement. On June 1, 2006, the parties filed a notice of settlement, which was scheduled for a hearing to take place on July 5, 2006. At that hearing, the court indicated that it intended to dismiss the complaint filed by the Debtors and also disapprove the settlement reached by the parties.

The following shall constitute the Court's findings of fact and conclusions of law in regard to the merits of the Debtors' complaint and the proposed settlement. This Court has jurisdiction over the matter as a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E) and may enter a final judgment in this case.

I.

BACKGROUND

The Debtors filed a voluntary petition for relief under the provisions of Chapter 13 of the United States Bankruptcy Code on March 3, 2003. After two modifications, the second modified plan was confirmed on July 30, 2003.

The second modified plan, which incorporated provisions of the first and second proposed plans, provided that the plan length would remain 58 months in duration. The Debtors reduced their plan payment from $939.00 to $775.00 a month. Language in the plan stated that "Debtors shall submit all projected disposable income for the benefit of unsecured creditors during the first 36 months of the plan in accord with 11 U.S.C. § 1325." (Modification of Chapter 13 Plan, July 1, 2003.)

The only secured claim to be paid in full over the life of the plan arose from a debt to Dewitt Bank & Trust, with a value of $32,500.00 to be paid at the rate of 6% interest. A provision of the original plan that was incorporated into the second modification stated that nonpriority unsecured creditors would receive a pro-rata dividend from funds remaining after payment of administrative, secured, priority, child support and special nonpriority unsecured claims.

The Debtors' schedules list $40,456.57 in general unsecured debt and no priority debts. Schedules I and J state the Debtors' monthly income at $2048.70 and monthly expenses at $1110.00, which leaves income of $939.00 available to be paid into the plan. Cameron v. Cameron (In re Cameron), 243 B.R. 117, 122 (M.D. Ala. 1999)(difference between debtor's income and necessary expenses is disposable income)(citing Sparagna v. Metzger (In re Metzger), 232 B.R. 658, 664 (Bankr. E.D. Va. 1999); Soforenko v. Soforenko (In re Soforenko), 203 B.R. 853, 864 (Bankr. D.Mass. 1997); Smith v. Smith (In re Smith), 218 B.R. 254, 259 (Bankr. S.D. Ga. 1997); Willey v. Willey (In re Willey), 198 B.R. 1007, 1014 (Bankr. S.D. Fla. 1996)). These schedules have never been amended even though the Debtors' plan payment is

only $775.00 per month.[1]

On March 29, 2005, the Debtors filed a motion to settle a tort claim that had been scheduled, but valued at "unknown." (Trustee's Ex. 1, Schedule B–Personal Property.) The settlement was approved by the Court, and the sum of $30,056.03 was paid to the Trustee, who was handling the case personally.

Jeremy Bueker, an attorney for the Debtors, testified that he represented the Debtors in connection with the settlement of the tort suit. He identified Plaintiff's Exhibit 3, a series of e-mails between himself and the Trustee. The Trustee also testified that she had other communication with the Debtors' attorney by telephone. The substance of the emails and phone calls concerned how the proceeds of the tort suit were to be distributed. Bueker took the position that the unsecured creditors should not receive a distribution from the tort claim until the debt secured by the Debtor's home was paid in full. The Trustee interpreted the plan to require the proceeds to be distributed to unsecured creditors because the debt secured by the Debtors' home would be paid in full during the life of the plan by the monthly payment of $775.00 from the Debtors' future income.

The exchange of e-mails ended with the Trustee stating, "I will pay it out but add whatever the amount is to the base so the unsecured creditors are being paid with monthly payments." (Pl.'s Ex. 3.) Whatever this statement means, the Debtors' attorney did nothing by way of modifying the plan to accommodate the Trustee's request.

Bueker understood that the Trustee agreed to distribute the proceeds to pay the claim

---

[1] The record does not explain why the Debtors are not paying all of their disposable income into the plan as proposed.

4

secured by the Debtors' home and that the Debtors would continue in the case for the full 58 months, and, therefore, unsecured creditors would receive much of the $775.00 per month payment over the life of the plan. (Tr. at 21.) The motion to settle claim that was agreed on, however, simply stated that the funds would be distributed to the Trustee to be disbursed pursuant to the confirmed plan, except that the Debtors would be allowed to request a refund. (Pl.'s Ex. 2.).

Contrary to the understanding between the Trustee and Bueker, the Trustee's office distributed approximately $20,000.00 to unsecured creditors shortly after receipt of the tort settlement.[2] The Trustee testified she forgot to inform her staff of her agreement with Bueker, and the money was paid pursuant to established procedures. As a result, the Debtors filed this adversary proceeding seeking to recover the funds from the Trustee and the creditors.

II.

THE ARGUMENTS

In their complaint, the Debtors allege that they should have judgment against the Trustee and each of the unsecured creditors on a pro rata basis in the sum of $19,150.37 because the distribution was made outside the terms of the confirmed plan and in breach of an agreement with the Trustee.

No one disputes that the tort settlement was paid during the first 36 months of the plan. Further, the proceeds constitute disposable income. Watters v. McRoberts, 167 B.R. 146, 147

---

[2]Goldman testified she distributed $20,000.00 to unsecured creditors representing a dividend of 45 percent. (Tr. 42.)

(S.D. Ill. 1994)(stating that since debtors' personal injury recovery was not needed for expenses, full amount was to be paid into the chapter 13 plan as disposable income). See also In re Pendleton, 225 B.R. 425, 427-28 (Bankr. E.D. Ark. 1998) (holding that personal injury proceeds were disposable income, even if claimed exempt). If the money is distributed improperly and not pursuant to the plan, courts have held the trustee liable. Nash v. Kester (In re Nash), 765 F.2d 1410, 1415 (9th Cir. 1985) (holding trustee liable for improper distribution in Chapter 13 case); In re Estrada, 322 B.R. 149, 151 (Bankr. E.D. Cal. 2005) (stating that a trustee who has erroneously distributed dividend must recover the overpayment and if he cannot, he may have to personally make good on the misdirected payment).

The Debtors argue that the terms of the confirmed plan required the Trustee to pay the entire balance of the proceeds of the tort suit to defray the claim of Dewitt Bank & Trust that is secured by a lien in real property used as the Debtors' primary residence. The plan did not specify how much per month was proposed to be paid to this creditor, but only provided that the amount of the claim was $32,500.00 and that the claim was to be paid in full over the 58-month life of the plan, including interest at the rate of 6% per annum. The second modified plan listed no other secured creditors and proposed to pay $775.00 per month to the Trustee to pay the one secured claim and the administrative claims in full. The plan proposed for payment to the unsecured creditors to be pro rata.

The dispute in this case centers around two contradictory provisions in the confirmed plan. One provision provides, "Debtors shall submit all projected disposable income for the benefit of unsecured creditors during the first 36 months of the plan in accord with 11 U.S.C. § 1325." (Pl.'s Ex. 1, Modification of Chapter 13 Plan.) A second provision provides,

6

"nonpriority unsecured creditors shall receive a pro-rata dividend from funds remaining after payment of administrative, secured, priority, child support, and specific non-priority claims." (Pl.'s Ex. 1, Chapter 13 Narrative Statement of Plan.)

To compound the issues raised in the case, the Debtors filed a third modified plan on March 16, 2006, while this adversary proceeding was pending and after the case had been pending for 36 months. The third modified plan proposed no further distribution to unsecured creditors in the case. Neither the Trustee nor any creditor objected to confirmation; therefore, the modified plan was confirmed on April 11, 2006.[3]

The Debtors argue that the two contradictory plan provisions are actually consistent with each other. The Debtors' argument is difficult to follow. The following is an example:

> The two paragraphs in question are not in contradiction. They must, however, be read and interpreted together which results in the understanding indicated in the paragraph above. The understanding is that the benefit to the unsecured creditors is all projected disposable income is committed to the plan for the first 36 months of the plan so that after payment of the superior claims, i.e. Administrative, Secured, Priority, Child Support and Special Non-Priority Unsecured, they (nonpriority unsecured) will share in the remaining funds on a pro rata basis.
>
> The purpose of the first paragraph - *"Debtor shall submit all projected disposable income for the benefit of unsecured creditors during the first 36 months of the*

---

[3] The Trustee admitted she should have objected to the third modification. When questioned by the Court, she stated,

| | |
|---|---|
| The Court: | And you were in a position to object to his modification if he didn't do that, I assume? |
| The Witness: | I was. Those modifications come through routinely in my office with 9,000 cases, and obviously, we didn't object to this modification in March when it came in paying zero percent. |
| The Court: | You would have if you had noticed it? |
| The Witness: | Yeah, we should have. |

(Tr. 56)

7

*plan*" - is to insure that the debtor is in a plan for at least 36 months. Otherwise, plans would be devised to only pay the superior claims and indicate a zero percent 0% distribution to non-priority unsecured claims, and upon satisfaction of claims, other than non-priority unsecureds, the plan would conclude and the debtor receive a discharge before conclusion of the 36th month, and non-priority secureds receive nothing ($00.00).

(Pl.'s Post-Hearing Brief, May 24, 2006.)

Although the Trustee did not file a brief in the adversary proceeding, she attempted to explain her interpretation of the plan at the hearing. She stated that the regular plan payment of $775.00 was distributed by her office more or less in conformity with the paragraph dealing with the priority of payments, i.e., the administrative claims paid in full first, the secured claims paid in full, and then any remaining monies would be paid to unsecured creditors toward the end of the case.

However, when the personal injury money became available she interpreted the plan to require this money to go to unsecured creditors. She stated,

> A. Yes, we interpret the debtors' plan -- and we request that the disposable income language be put in there because at the time that this case was filed, and the law, was that all disposable income would be paid in for the benefit of unsecured creditors.
>
> When we get personal injury money, the only way to make sure that that money does go to the benefit of the unsecured creditors is to pay that out to unsecured creditors. However, we always make sure that the plan is current at the time so that none of the secured -- all of the secured creditors are current in their payments and the plan is actually current, if and when we do that.
>
> Q. The proceeds that were paid to unsecured creditors, do you know the percentage to the unsecureds that they received?
>
> A. 45 percent -- I believe it's 45 percent.

(Tr. at 41-42.)

When asked if she had actually intended to pay secured claims with the settlement

8

proceeds, pursuant to the agreement with Bueker, she stated,

> A. Well, Mr. Bueker and I had conversations other than the email. We actually did have a telephone conversation, and that conversation entailed, "Why does it matter if the debtor wants to continue to pay the 775 a month anyway? The same money is going to go to unsecured creditors, so why does it matter?"
>
> When I get a request like this, it would be a courteous request that I would grant a request like this because it's not being done in the ordinary course of my business, which means it has to become now a manual process for my staff.
>
> So it would have been out of courtesy. But with my conversation with Mr. Bueker the result would have been the same because had the unsecured creditors not gotten the benefit of the 20,000 when I paid it out, they would have gotten -- they would have gotten the 775 a month, and they would have gotten–they would have gotten that money anyway.
>
> So if the debtor didn't intend on changing the plan terms, or doing anything else during the course of the plan, then the net result would have been the same, which would have been the only reason why I would have told Mr. Bueker I could do that.
>
> But I did refuse to sign off on the original order because I needed to be able to disburse the money as the plan -- as the plan states and make sure that the unsecured creditors do get that disposable income.

(Tr. at 43-44.)

When asked how she reconciled the two contradictory sentences in the plan, the Trustee testified,

> Q. In order to reconcile the two paragraphs, "Debtor shall submit all projected disposable income for the benefit of unsecureds," and "Nonpriority unsecureds shall receive a pro rata dividend after payment of administrative, secured, priority, child support, and special nonpriority unsecured." The way to reconcile that is the first paragraph talks about projected disposable income?
>
> A. Under the old law additional disposable income is the additional disposable income. The projected disposable income is the plan payment. And that is where it comes in -- that is what, under what you're saying, would come in and pay the secured, the priority, and all those debts.
> The additional disposable income is the personal injury settlement and that

9

comes in for the benefit of the unsecured creditors.

Q.  But there is no plan language that talks about this other special disposable income, is there?

A.  The disposable income, we interpret that paragraph to mean that all disposable income that has come into the plan, and then when you notice up here your settlement, we request that the order read that it come into the plan, period, and it gets disbursed.

So, yeah, it gets disbursed to unsecured creditors. What debtors' attorneys and sometimes debtors don't understand is, is the Trustee often pays unsecured creditors with what you are calling projected disposable income, which is the plan payment, all the time in connection with the -- while secured debt is being paid, because what happens is, is that as the -- if you have a monthly payment secured creditor, for instance, then if everybody is current, you always drop down to the next level.

So you can look at some of your cases and you will find that unsecured creditors are being paid at the same time as the secured creditors.

(Tr. at 48 - 49.)

Upon examination by the Court as to her method of disbursement to various levels of creditors, the Trustee further explained,

THE WITNESS: [T]he payments are always disbursed in Chapter 13 pursuant to the terms of the confirmed plan.

THE COURT: All right. And in this case can you reconcile in the original plan the provision that says, "Nonpriority unsecureds shall receive pro rata dividend remaining after payment of administrative, secured, priority, child support, and special nonpriority unsecured claims," with the provisions that say in the modification that, "Debtor shall submit all projected disposable income for the benefit of unsecured creditors during the first 36 months of the plan?"

THE WITNESS:  The way we interpret that is that the regular plan payment pays the priority down. And that the projected disposable income is what in the old Code was the disposable income that would be paid in for the benefit of unsecured creditors.

So I don't think that there is necessarily a contradiction in terms because this is

10

excess money.  So the way that the normal disbursement process goes, in all
cases, is that money will always filter down to the next level when the level above
it is current, but that's when the regular monthly payments are coming in, not
additional personal injury money and things like that.  We handle those
differently.

(Tr. at 51 - 52.)

The Trustee admitted that she agreed with Bueker to pay the proceeds of the tort settlement to the bank as a courtesy even though she interpreted the plan as requiring her to pay the settlement proceeds to unsecured creditors.  She said she agreed to do that, hoping the Debtors would not file a modification after 36 months to discontinue any payments to unsecured creditors.  Of course, this is exactly what the Debtors did.

### III.

### DISCUSSION

The Bankruptcy Code provides in relevant part that a plan will be confirmed if --

(4) the value, as of the effective date of the plan, of property to be distributed
under the plan on account of each allowed unsecured claim is not less than the
amount that would be paid on such claim if the estate of the debtor were
liquidated under chapter 7 of this title on such date;

11 U.S.C. § 1325(a)(4) (2000).

If the Trustee had paid the proceeds to the Debtors' secured creditor and the Debtors had modified their plan after 36 months to cease payments to unsecured creditors (which the Debtors did), then the distribution to the secured creditor would not comply with section 1325(a)(4). The plan for distribution would not comply because the unsecured creditors would not have received any of the proceeds of the tort claim but would have received those proceeds under Chapter 7.

To distribute the funds as the Debtors propose, the Trustee would also have had to ignore

11

the paragraph in the plan that provided that the disposable income received during the first 36 months of the plan was for the benefit of unsecured creditors. Therefore, the Court concludes that paying the tort proceeds to the unsecured creditors is more consistent with the Code and more reasonable, considering the poorly drafted plan, than paying the entire sum to the secured creditor.

The plan drafted by the Debtors and approved by the Trustee contains inherently contradictory provisions for the payment to creditors. The Debtors' argument in support of their interpretation of the plan is as incoherent as the Trustee's explanation in her testimony. The Trustee in making distribution under the plan has to choose one or the other of the contradictory paragraphs to make payment. The Trustee should insist that all Chapter 13 plans, including this one, be clear and specific in their treatment of creditors' claims, and the Trustee should object to any plan that is incomprehensible.

Section 1322(b)(4) of the Bankruptcy Code allows a plan to provide for concurrent payments to secured and unsecured creditors; however, most debtors prefer to pay secured creditors first in case of dismissal, conversion or modification. 8 Collier on Bankruptcy ¶ 1322.08 (Alan N. Resnick & Henry J. Sommer et al., eds., 15th ed. rev. 1993). In this case, because of the large influx of extra disposable income during the first 36 months of the plan, the Trustee or Debtors should have filed a modification pursuant to 11 U.S.C. § 1329(a) to include the tort award in the plan distribution by increasing payments during the first 36 months of the plan. See, e.g., 3 Keith M. Lundin, Chapter 13 Bankruptcy § 266.1 (3d ed. 2000 & Supp. 2004)(observing courts have "aggressively allowed" trustees and unsecured claim holders to modify plans to increase payments when debtors have realized new income).

Instead of filing a modified plan to deal with the changed circumstances pursuant to section 1329, the Debtors' counsel and the Trustee arrived at an agreement that was not disclosed to either the Court or other parties in interest who might have objected. This secret agreement for distribution under the existing plan was admittedly contrary to what the Trustee thought was a proper distribution. In the Court's opinion, if the Trustee had performed as she agreed, she would have been guilty of malfeasance. She said she did this as a favor to Debtors' counsel. The fact that the agreement was undisclosed does not reflect favorably on either the Trustee or Bueker.

The Debtors' final argument is that an injustice has occurred because the Chapter 13 Trustee breached her agreement with counsel for the Debtors to pay the bank's secured claim. The Trustee does not dispute this and admits that she was at fault for not notifying her staff of the agreement.

The Debtors are, however, not entitled to recourse against the Trustee because the Debtors were acting in *pari delicto* with the Trustee to make distribution contrary to her interpretation of the plan. Furthermore the Debtors themselves drafted a plan with conflicting provisions relating to distribution. Therefore, the Debtors are not entitled to relief in this Court of equity under the doctrine of unclean hands. For these reasons, the plaintiffs' complaint for turnover as to all defendants is dismissed.

IT IS SO ORDERED.

JAMES G. MIXON
U. S. BANKRUPTCY JUDGE
DATE: 10/03/06

cc:	U. S. Trustee
	Jo-Ann Goldman, Chapter 13 Trustee
	Gary Eubanks & Associates
	Greg Niblock, Esq.
	Jeremy Bueker, Esq.
	Debtors
	Bank of America
	Capitol One Bank
	Ar Specialty Care Centers
	Ecast Settlement Corporation
	Dewitt City Bank & Trust Co.
	Dewitt City Hospital
	Discover Bank Financial Services
	St. Vincent's Health System
	Kyle Havner, Esq.