# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

---

07-6010/6016EA

---

| | |
|---|---|
| In re: James Morgan and Linda Morgan, * | **F I L E D** |
| * | U.S. BANKRUPTCY COURT |
| Debtors * | EST & WST DISTS. OF ARK. |
| * | **SEP 2 4 2007** |
| James Morgan and Linda Morgan, * | By: JEAN ROLFS, CLERK |
| * | DEP. CLERK |

In re: James Morgan and Linda Morgan, *
                                 *

    Debtors                      *
                                   *

James Morgan and Linda Morgan, *
                                   *

    Plaintiffs                   *
                                   *    Appeals from the United States

        v.                    *    Bankruptcy Court for the
                                   *    Eastern District of Arkansas

Jo-Ann L. Goldman, *

    Defendant - Appellant *

Bank of America; Capitol One Bank; *
AR Specialty Care Centers; *
eCAST Settlement Corporation; *
DeWitt Bank & Trust Company; *
DeWitt City Hospital; Discover Bank; *
St. Vincent's Health System; and *
Kyle Havner, *

    Defendants *

---

In re:  Janet Lavern Dedmon, *
                                   *

    Debtor                      *
                                   *

Jo-Ann L. Goldman,                              *
                                                *
    Trustee - Appellant         *
_____

The National Association of                     *
Chapter Thirteen Trustees,                      *
                                                *
    Amicus on Behalf of Appellant   *

_____

Submitted: August 15, 2007
Filed: September 24, 2007
_____

Before KRESSEL, Chief Judge, FEDERMAN and MAHONEY, Bankruptcy Judges

FEDERMAN, Bankruptcy Judge

    Appellant Jo-Ann L. Goldman is one of three standing Chapter 13 trustees for the Bankruptcy Court in the Eastern District of Arkansas.  In these consolidated appeals, Ms. Goldman appeals from orders entered in two cases in which two of the bankruptcy judges sitting in the Eastern District of Arkansas removed her as trustee in all pending cases.[1]  For the reasons that follow, we reverse the Order entered in the Dedmon case and affirm the Order entered in the Morgan case.[2]

_____

    [1] *In re Morgan*, Case No. 03-12580 (the "Morgan case"), and *In re Dedmon*, Case No. 05-17166 (the "Dedmon case").  Hereafter, we refer to the judges in Morgan and the Dedmon case as the "Morgan judge" and the "Dedmon judge," respectively.

    [2] Judge Mahoney joins in the portion of this opinion reversing the Order in the Dedmon case.  Judge Kressel joins in the portion affirming the Order in the Morgan case. Therefore, this opinion represents the majority opinion as to both appeals.

## I.  THE MORGAN CASE

James and Linda Morgan filed a voluntary Chapter 13 petition on March 3, 2003, and Ms. Goldman was appointed as the trustee in their case.  On July 30, 2003, the Morgan judge confirmed an amended plan which provided for monthly payments of $775 for 58 months.  The Morgans' residential mortgage lender (their only secured creditor at the time) was to be paid the full value of its claim, $32,500, with interest, through the plan.  General unsecured claims, which totaled $40,456.57, were to "receive a pro rata dividend from funds remaining after payment of administrative, secured, priority, child support, and special nonpriority unsecured claims."  There were no priority, child support, or special nonpriority unsecured claims.  Thus, out of the regular monthly payments, it was anticipated that the costs of administration and the home mortgage would be paid first by the trustee, with any remaining funds being paid to unsecured creditors.  However, the plan further provided that all of the Morgans' projected disposable income received during the first 36 months of the plan would be paid in for the benefit of unsecured creditors in accord with § 1325(b)(1).  This latter provision became important because the Morgans settled a personal injury tort claim during those first 36 months.

### A.  The Tort Claim

On March 29, 2005, the Morgans moved for court approval to settle a tort claim which they had listed in their schedules as an unliquidated claim with an unknown value.  After payment of attorneys' fees and costs, the settlement was to generate $30,056.03 in net proceeds.  The Morgans' motion to approve the settlement stated, in relevant part, "[f]unds to be remitted to the Chapter 13 Trustee to be distributed pursuant to the debtors' confirmed plan, with the exception that debtors will be allowed to request a refund in a sum sufficient to replace the roof on their home and repair debtors' vehicle."

3

After the motion to approve the settlement was filed, and before the Morgan judge entered an order approving such motion, Ms. Goldman and the Morgans' attorney, Jeremy Bueker, discussed the distribution of the settlement proceeds in a series of e-mail and telephone conversations.  In addition to requesting a refund of a portion of the proceeds for roof and vehicle repairs, the Morgans wanted all of the remainder to be used to pay off their home mortgage.  Ms. Goldman, on the other hand, took the position with Mr. Bueker that the funds not being refunded to the debtors were projected disposable income which, under the plan, should be paid by the trustee to unsecured creditors.  Therefore, she asked that the order approving the settlement provide either that she pay such funds directly to unsecured creditors, or that future payments continue so that an equivalent amount would be made available to such unsecured creditors.  As to the distribution of the portion not to be refunded to the Morgans, the following e-mail exchange occurred between Ms. Goldman and Mr. Bueker on April 25 and 26, 2005:

From Ms. Goldman to Mr. Bueker:

Jeremy –

I need you to revise this Order.  If a case is under 36 months we consider proceeds of this nature disposable income only to the extent that the debtor does not get a refund that is reasonably necessary for her to live – so, any proceeds from a settlement that we don't refund to the debtor would be paid as such, i.e., they would be paid to unsecured creditors, or the base balance would be raised by the amount of the proceeds (if we elect to go ahead and let the secured get paid.)  The way your order reads, you want it to be paid towards the base (disbursed pursuant to the plan) as if they were in place of regular monthly payments.  So, I need you to simply revise the Order that states that the proceeds will come to the trustee.

4

From Mr. Bueker to Ms. Goldman:

> My intention was to be certain that secured and priority creditors are paid in full before money is disbursed to unsecured creditors and to make certain that debtors can request a refund. If the base needs to be raised to accomplish this, that is fine. What language do you suggest that I use to make sure that is how money is disbursed? Mr. and Mrs. Morgan understand that their payments to the Trustee's office are to continue.

From Ms. Goldman to Mr. Bueker:

> The problem is that is not how extra disposable income is supposed to work – that money is for unsecured creditors – I can do that, but the base will have to be raised. Just state the money is coming to my office period. We put the money on hold for 30 days for the debtor to request the refund.

From Mr. Bueker to Ms. Goldman:

> If I state that the money comes to your office period, will you first pay off secured and then priority claims before money is disbursed to unsecured creditors? If not, I think the debtors are better off dismissing or converting to Chapter 7. I advised them to proceed this way so that their house would be paid off.

From Ms. Goldman to Mr. Bueker:

> I will pay it out but add whatever the amount is to the base, so the unsecured creditors are being paid with the monthly payments.

From Mr. Bueker to Ms. Goldman:

> Attached is the revised Order.

On April 26, 2005, having received no objections to the motion to settle, the Court entered the Order which was referenced in the e-mails, as prepared by Mr.

5

Bueker and modified at Ms. Goldman's request. Such Order stated that there had been no objection to the March 29, 2005 Motion, and that the Motion "appears proper, and the same is GRANTED." It went on to state that the $30,056.03 in proceeds were "to be utilized as follows: Said funds shall be paid to the Chapter 13 Trustee Jo-Ann Goldman and Debtors may apply for a refund from said funds." Notably, the Order does not state anything as to whether, or how, Ms. Goldman was to distribute the rest of the proceeds, other than the refunded portion. Thus, despite any intervening e-mails or telephone conversations between Mr. Bueker and Ms. Goldman, the Order served to grant a Motion stating that the funds not being refunded were to be "distributed pursuant to the debtors' confirmed plan."

On May 5, 2005, Ms. Goldman received $30,056.03 in net proceeds from the settlement.

Apparently, at that time, it was customary in the Eastern District of Arkansas for debtors to request refunds from the trustee, and for the trustee to grant or deny such requests based on his or her own judgment. No court approval was required, no matter how large the request, unless the trustee decided that the request was not necessary for the debtor's reasonable living expenses. Hence, the provisions in the motion to settle and the accompanying Order which allowed for a refund meant that the Morgans needed only to ask Ms. Goldman for the refund.

On May 6, 2005, the Morgans did ask Ms. Goldman for a refund of $9,094.17 to replace their roof and repair a vehicle, and supported their request with written estimates of costs. On May 18, 2005, Ms. Goldman refunded more than they had requested, $10,000, without notice to creditors or a court order.

As to the $20,056.03 in proceeds remaining after the refund (sometimes referred to as the "$20,000 amount"), Ms. Goldman later testified, as described more fully below, that she intended to make a notation in her files not to distribute the funds

to unsecured creditors, but she neglected to do so.  Accordingly, when the next monthly disbursement day came around, her office distributed the $20,000 amount to general unsecured creditors pursuant to the office's established procedures, instead of using those funds to pay off the Morgans' home mortgage.

### B.  The Morgans' Action Against Goldman and Others and The Morgan Judge's Order to Show Cause on the Refund

On August 30, 2005, the Morgans filed an adversary proceeding for turnover against Ms. Goldman personally, as well as against the unsecured creditors who benefitted from the distribution of the $20,000 amount.  The Morgans asserted that the distribution to unsecured creditors violated the plan provision requiring that unsecured creditors would receive a dividend "from funds remaining after payment of administrative and secured claims."  Further, the Morgans asserted, the distribution violated an agreement between Mr. Bueker and Ms. Goldman to distribute the money to the mortgage lender.  In her Answer, filed September 9, 2005, Ms. Goldman stated that her office had properly distributed the funds under the terms of the plan and the Bankruptcy Code.

Thereafter, and while the adversary proceeding was pending, on March 16, 2006, the Morgans filed another amended plan, reducing the plan length from 58 months to 36 months.  Neither Ms. Goldman nor any creditor objected, and the amended  plan was confirmed.

The Morgan judge held a hearing in the adversary action on May 10, 2006.  During the hearing, the Court observed that the plan had inconsistent provisions – it provided for payment to unsecured creditors *after* payment of administrative and expense claims, but it also required the Morgans to pay all projected disposable income received in the first 36 months for the benefit of unsecured creditors.  The issue at the hearing was whether Ms. Goldman had agreed with Mr. Bueker to pay the $20,000 amount to the mortgage creditor, rather than to the unsecured creditors.  As

7

discussed more fully below, Ms. Goldman testified as to her understanding coming from the e-mails and telephone conversations. At the conclusion of the hearing, the Morgan judge took the matter under advisement and suggested that the parties might consider settling the matter.

The parties did propose a settlement, in which Ms. Goldman agreed to recover enough of the payments from the unsecured creditors to pay off the mortgage. In proposing such a settlement, she effectively took the position that the distribution to unsecured creditors was an error on her part. In taking this position, she proposed a settlement which, if approved, would have relieved her of any personal liability she may have had to the Morgans. The unsecured creditors were not parties to this proposed settlement, although they were notified of it.

On June 22, 2006, the Morgan judge issued an Order to Show Cause in the Morgans' main bankruptcy case why the Morgans and Ms. Goldman should not be required to jointly or individually reimburse the estate for the $10,000 refund which had not been authorized by court order. The Morgans were also ordered to provide a detailed accounting of where the $10,000 went.

On July 5, 2006, the Morgan judge held a hearing on the proposed settlement in the adversary action, and the Order to Show Cause concerning the $10,000 refund. At that hearing, the Morgan judge announced that he would not approve the settlement because, among other things, there was no authority under which Ms. Morgan could go after the unsecured creditors for the money she had distributed according to the confirmed plan in place at the time of the distribution. The Morgan judge expressed concern over the fact that the alleged agreement between Ms. Goldman and Mr. Bueker concerning distribution of the $20,000 amount had occurred through what he referred to as "secret communications," and also that complying with the Morgans' request to distribute the money to the mortgage lender would have required Ms. Goldman to violate her duties as trustee to faithfully distribute monies according to

8

the plan.  The Morgan judge said he would likely have approved the distribution to the secured lender, if the Morgans had modified their plan to provide that they stay in the case long enough for the unsecured creditors to be paid what they should by the end of the plan.  But, because they did not request Court approval of the scheme, the Morgan judge found that the Morgans were estopped from requesting turnover of those funds from either Ms. Goldman or the unsecured creditors.

The Morgan judge then inquired about the $10,000 refund approved by Ms. Goldman.  Among other things, the Morgan judge learned that, although the Morgans used some of the money to repair a vehicle and patch the roof, they used the majority of the refund, not for a new roof, but for, *inter alia*, gambling, travel, paying credit cards, and making their plan payments.  The Morgan judge took under advisement the question of whether to require the Morgans or Ms. Goldman to pay back the $10,000 refund.

On October 3, 2006, the Morgan judge entered an Order and Memorandum Opinion in the adversary action, finding that the Morgans were not entitled to recover the $20,000 amount from either Ms. Goldman or the unsecured creditors.  The Morgan judge found the Morgans' plan to be poorly drafted and inherently contradictory with regard to distributions.  Further, the Morgan judge found that distributing the money as the Morgans requested to the mortgage lender, without an amendment of the plan to commit the Morgans to stay in for 58 months, would have violated the best interests of creditors test under § 1325(a)(4).  Paying the tort proceeds to unsecured creditors was, according to the Morgan judge, more consistent with the Code and more reasonable, considering the poorly drafted plan, than paying the entire sum to the mortgage lender.  Accordingly, the Morgan judge said, the adversary action requesting turnover of those funds would be dismissed.

On October 10, 2006, the Morgan judge issued an Amended Order finding that Ms. Goldman had violated her fiduciary duties in authorizing the $10,000 refund.  The

Morgan judge ordered her to reimburse the estate for that money and to distribute it to the unsecured creditors *pro rata*. The Morgan judge also found that the Morgans had committed a fraud on the Court by requesting and spending the refund as they did, and ordered them to reimburse the trustee for the $10,000 refund. The parties appealed that Order to the District Court. The Morgan judge did not take any steps to remove Ms. Goldman based on the breach of fiduciary duties he found to have taken place in connection with the $10,000 refund.

The Morgans filed a motion to amend the October 3 Order dismissing the adversary action or for new trial, arguing, among other things, that the plan language and practices criticized by the Morgan judge were customary in that district, and it was not equitable to punish the Morgans when this practice had been going on there for many years. The Morgan judge set this motion for hearing on November 7, 2006, at which time Ms. Goldman testified again about the purported agreement with Mr. Bueker regarding the distribution of the $20,000 amount. The substance of her testimony is discussed more fully below, but the crux of her testimony at this hearing was that she had not entered into any agreement with Mr. Bueker regarding distribution of the $20,000 amount. The Morgan judge again took the matter under advisement.

On November 20, 2006, the Morgan judge entered an order denying the relief sought by the Morgans in their motion to amend. The Morgan judge found that whether or not Mr. Bueker and Ms. Goldman had an agreement as to the distribution of funds was beside the point because she had no authority to distribute funds except as provided in a confirmed plan or authorized by court order. Also on November 20, 2006, the Morgan judge entered an Order directing Ms. Goldman to show cause why she should not be removed as trustee in the Morgan case only, due to what the Morgan judge perceived to be false testimony at the November 7 hearing. Specifically, the Morgan judge commented that Ms. Goldman's testimony at the November 7 hearing was that she had no agreement with Bueker, but that this differed from her testimony

10

at the May 10 hearing.  The Morgan judge also found that the e-mails showed that she had, in fact, made an agreement with Mr. Bueker and, therefore, her testimony that she had no agreement to pay the mortgage lender was false.  On December 15, 2006, the Morgan judge expanded the scope of his show cause Order to include removal in all cases, and further ordered Goldman to show cause why she should not be suspended from practice before the bankruptcy court or referred to the Arkansas Committee on Professional Conduct.  The expanded scope of the show cause Order followed the entry of an Order to Show Cause by the Dedmon judge, discussed below.  The Morgan judge held a hearing on his Orders to Show Cause on January 19, 2007.

## II.  THE DEDMON CASE

One day after the Morgan judge had issued his November 20 Order to show cause regarding Goldman's removal from the Morgan case, the bankruptcy judge presiding over the Dedmon case issued an Order to show cause why Ms. Goldman should not be removed as trustee in all of her cases, and be sanctioned, suspended, or disbarred from practice before the Court, based on the events that occurred in the Morgan case.  In response to the Dedmon judge's Order to Show Cause, the United States Trustee filed a motion asking the Dedmon judge to abstain, since the matters involving the Morgan case were pending before the Morgan judge.  The Dedmon judge denied the U.S. Trustee's motion.  The Dedmon judge held a hearing on his own Order to show cause on February 22, 2007, at which a transcript of the January 19 hearing on the Morgan judge's Order to Show Cause was incorporated into the record.

## III.  THE ORDERS OF REMOVAL

On March 15, 2007, while the Morgan judge still had his Orders to Show Cause under advisement, the Dedmon judge issued an Order removing Ms. Goldman from all of her cases, based solely on her conduct in the Morgan case.  In addition, the Dedmon judge referred Ms. Goldman to the Arkansas Supreme Court's Committee

on Professional Conduct, as well as the U.S. Attorney, for disciplinary review. Thereafter, on April 3, 2007, the Morgan judge issued his own Order removing Ms. Goldman as trustee in all of her cases in that Court, based on the findings made by the Dedmon judge in his March 15 Order.  Finding that removing her from her cases as trustee was sufficient sanction for her conduct, the Morgan judge did not suspend Ms. Goldman from practice in the Bankruptcy Court, nor did he refer her to the Committee on Professional Conduct.

Ms. Goldman appeals both Orders removing her as trustee.

## IV.  DISCUSSION

### A.  Standard of Review

"Removal of a trustee is a matter committed to the sound discretion of the bankruptcy court."[3]  "An abuse of discretion occurs when the reviewing court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."[4]  To the extent that the removal is based on a finding of fact, the standard is clear error.

### B.  Standard for Removal

Section 324 of the Bankruptcy Code provides:

---

[3]  *In re Miller*, 302 B.R. 705, 708 (B.A.P. 10th Cir. 2003) (citing *In re BH & P, Inc.*, 949 F.2d 1300, 1313 (3d Cir. 1991); *In re Woods*, 173 F.3d 770, 778 (10th Cir. 1999)).

[4]  *DeBold v. Case (In re Tri-River Trading), LLC*, 329 B.R. 252, 263 (B.A.P. 8th Cir. 2005) (citations omitted).

(a) The court, after notice and a hearing, may remove a trustee, other than the United States trustee, or an examiner, for cause.

(b) Whenever the court removes a trustee or examiner under subsection (a) in a case under this title, such trustee or examiner shall thereby be removed in all other cases under this title in which such trustee or examiner is then serving unless the court orders otherwise.[5]

Removal of a trustee is an extreme remedy.[6]  "What constitutes sufficient cause for removal is not defined in the Bankruptcy Code, but is instead left for the courts to determine on a case-by-case basis."[7]  "Causes for removal include situations in which the trustee is found to be incompetent or unwilling to perform the duties of a trustee; the trustee is not disinterested or holds an interest adverse to the estate; the trustee violates the fiduciary duty to the estate; and where the trustee is guilty of misconduct in office or personal misconduct."[8]  Some courts have held that actual injury or fraud must be shown.[9]  Others have found that removal can be based "not only [on] actual impropriety, but [on] the appearance of impropriety as well."[10]  Mistakes in discretionary judgment, which are reasonable, do not warrant removal.[11]  "Courts must

---

[5]  11 U.S.C. § 324.

[6]  *United States Trustee v. Repp (In re Sheehan)*, 185 B.R. 819, 822 (Bankr. D. Ariz. 1995).

[7]  *Id.*

[8]  *In re Waller*, 331 B.R. 489, 493 (Bankr. M.D. Ga. 2005) (quoting 3 Collier on Bankruptcy ¶ 324.02 (15th ed. rev. 2004)).

[9]  *See, e.g., In re Sheehan*, 185 B.R. at 824 (citations omitted).

[10]  *See* 3 Collier on Bankruptcy ¶ 324.02 at 324-4 (15th ed. rev. 2004), and cases cited therein.

[11]  *In re Sheehan*, 185 B.R. at 824 (citation omitted).

also consider the best interest of the estate when determining whether to remove a trustee."[12]

The statute notably omits any requirement that removal be based on a request by a party in interest; hence, a court can remove a trustee for cause *sua sponte*. Further, removal of a trustee from one case automatically constitutes removal of that trustee in all other cases in which the trustee is serving, unless the court orders otherwise.[13]   Since a bankruptcy court's removal from a single case for cause is reviewed under an abuse of discretion standard, a court's decision whether, or not, to limit removal to the single case would likewise be reversed only for an abuse of discretion.

## C.  Adequacy of Notice

The phrase "after notice and a hearing" is defined in § 102 of the Code to mean "after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances."[14]  Both the Morgan judge and the Dedmon judge issued Orders to Show Cause to Ms. Goldman regarding her removal, and each provided her with a hearing.  The question, however, is whether Ms. Goldman had sufficient notice as to what the two judges considered to be the "cause" for her removal, such that she had an opportunity to address those issues in responsive pleadings and hearings.

---

[12] *Id.*

[13] 11 U.S.C. § 324(b); *See Richman v. Straley*, 48 F.3d 1139, 1143 (10th Cir. 1995) (recognizing that, through the addition of § 324(b) to the Code, Congress explicitly added a presumption that removal in one case would constitute removal in all current cases) (citing H.R.Rep. No. 764, 99th Cong., U.S. Code Cong. & Admin. News 1986, 5227, 5236 (1986)).

[14] 11 U.S.C. § 102(1)(A).

When a party moves for removal of a trustee, the movant bears the burden of establishing cause by setting forth specific facts which support such removal.[15] "A conclusory contention unsupported by specific facts does not constitute sufficient grounds for the removal of a trustee."[16]  We believe that the same sort of notice, setting forth specific facts forming the basis for removal, is required when a court considers removal *sua sponte.*  Further, although the right to be a trustee is not a property right, removal from a particular case, or from all cases in which the trustee is acting, arguably deprives a trustee of a property right in specific employment.[17]  Under such circumstances, the type of notice required should be similar to that provided for a Rule 9011 violation or court disciplinary action.

Under Rule 9011, when a court issues an Order to Show Cause why a person should not be sanctioned for violating Rule 9011(b), the order must describe "the specific conduct that appears to violate [that provision]."[18]  "The notice must specify the conduct alleged to be sanctionable, the standard by which the conduct will be assessed, and the authority under which sanctions are being considered."[19]  An order that describes "general conduct" is not sufficient.[20]   Similarly, in a disciplinary

---

[15]  *Alexander v. Jensen-Carter (In re Alexander)*, 289 B.R. 711, 714 (B.A.P. 8th Cir. 2003).

[16]  *Id.  Accord In re Waller*, 331 B.R. at 493 (holding that conclusory allegations of cause for removal will not suffice).

[17]  *Richman v. Straley*, 48 F.3d at 1143 (holding that chapter 13 trustee had no property right in being a standing trustee; § 324 implies that no property right vests until actual assignment of a case) (*cited in* 3 Collier on Bankruptcy ¶ 324.03 at 324-5 (15th ed. rev. 2007)).

[18]  Fed. R. Bankr. P. 9011(c)(1)(B).

[19]  *Halverson v. Funaro (In re Funaro)*, 263 B.R. 892, 903 (B.A.P. 8th Cir. 2001).

[20]  *Thornton v. General Motors Corp.*, 136 F.3d 450, 454 (5th Cir. 1998) (reversing a district court's order or sanctions because the show cause order cited "general conduct

proceeding, an attorney "must receive prior notice as to the reach of the grievance procedure and the precise nature of the charges leveled against him."[21]

## C1.  Notice in the Dedmon Case

In the Dedmon case, the November 21, 2006 Order to Show Cause reads, in relevant part:

> Comes now the Court, sua sponte, and orders Jo-Ann Goldman, the chapter 13 trustee in the above captioned proceeding, to appear and respond or show cause to this Court why she should not be removed for cause as trustee in this case and all other cases under this title in which she is now serving.  This Order is issued pursuant to 11 U.S.C. § 105, 324, 1302 and 28 U.S.C. § 586.  Further, Ms. Goldman is directed to appear, respond, or show cause why she should not be sanctioned, suspended, or disbarred from practice before this Court for cause pursuant to Local Rule 2090-2 of the Local Rules of the United States Bankruptcy Court for the Eastern and Western Districts of Arkansas.

> The findings of fact and conclusions of law by the United States Bankruptcy Court for the Eastern District of Arkansas, Pine Bluff Division, in the case of *James and Linda Morgan*, No. 5:03-bk-12580M, including but not limited to that certain adversary proceeding, *James and Linda Morgan v. Jo-Ann Goldman, Chapter 13 Trustee et al.*, No. 5:05-ap-1244, constitute the basis for this Order and possible removal and/or sanctions.

---

in failing to produce evidence in support of [a claim]" and, therefore, did not sufficiently clarify what conduct the attorney needed to explain and justify in his response to the court).

[21]  *In re Crayton*, 192 B.R. 970, 978 (B.A.P. 9th Cir. 1996) (citing *In re Ruffalo*, 390 U.S. 544, 552, 88 S.C.t 1222, 1226, 20 L.Ed.2d 117 (1968)).

The Dedmon Order to Show Cause does not specify which of the Morgan judge's findings and conclusions formed the basis for removal and sanctions. Accordingly, we find that it did not provide Ms. Goldman with adequate notice, such that she could explain or justify her actions to the Dedmon judge. For that reason, we REVERSE the order of the Dedmon judge.

## C2.  Notice in the Morgan Case

In the Morgan case, the November 20, 2006 Order to Show Cause, in which the Morgan judge directed Ms. Goldman to show cause why she should not be removed as trustee in the Morgan case only, provided, in relevant part:

> Comes now the Court, sua sponte and orders Jo-Ann Goldman, Chapter 13 Trustee, to appear before the undersigned . . . . Jo-Ann Goldman is ordered to show cause why she should not be removed as Trustee in this case, pursuant to 11 U.S.C. § 105(a); 11 U.S.C. § 324; 11 U.S.C. § 1302, and 28 U.S.C. § 586, for cause in that she has given false testimony under oath at a hearing held in Pine Bluff, Arkansas, in a proceeding in this case (5:05-ap-1244) on November 7, 2006. Specifically, Jo-Ann Goldman testified that she had no agreement with counsel for the Debtors to distribute the sum of $19,150.37 to the [secured mortgage lender] from the proceeds of a post-petition settlement of a tort claim when, in truth and fact, she had made such an agreement, which she acknowledged in previous testimony. Her previous testimony was also corroborated by e-mails, the Debtors' testimony and the testimony of the Debtors' counsel, Jeremy Bueker. Excerpts of her testimony are attached hereto as Exhibits 'A' and 'B'.

> Further cause exists to remove Ms. Goldman as Trustee because she has a conflict of interest. She is a named defendant in her individual capacity in case number 5:05-ap-1244, and her interests are adverse to the interests of the estate over which she is Trustee.

17

Portions of the May 10, 2006, and November 7, 2006 transcripts were attached. The Morgan judge's December 15, 2006 Order to Show Cause, which expanded the scope of the sanction to removal in all pending cases assigned to her, suspension of practice, and referral to the Committee on Professional Conduct, contained similar language concerning the false testimony, but omitted the language concerning the conflict of interest.

Again, in his Order removing Ms. Goldman, the Morgan judge expressly found that she had given false testimony at the November 7 hearing. The Morgan judge also concurred with the findings and statements of law in the Dedmon judge's Order removing Ms. Goldman, in which the Dedmon judge removed her for the false testimony, her conflict of interest, and in making the unauthorized $10,000 refund to the Morgans. The Morgan judge's Orders to Show Cause did provide Ms. Goldman with adequate notice that the Court was considering removal based on her false testimony and conflict of interest in the adversary action. It mentioned nothing, however, regarding the $10,000 refund. Accordingly, we find that the Orders to Show Cause in the Morgan case did not provide Ms. Goldman with adequate notice that the refund could be grounds for her removal, and we will, therefore, not consider it as such a basis.[22] However, the Orders to Show Cause in the Morgan case did provide Ms. Goldman with adequate notice that the false testimony and conflict of interest were grounds being considered for her removal.

In sum, although the Morgan judge did not, on his own, make an express finding that Ms. Goldman had a conflict of interest, we can affirm the Morgan judge's

---

[22] We find another reason, besides inadequate notice, for concluding that the $10,000 refund could not have formed a basis for Ms. Goldman's removal. Specifically, several witnesses, including the other Chapter 13 trustees in the district, testified (and it appears to be undisputed) that such refunds without court authorization were, at the time, the established practice of all of the Chapter 13 trustees, and their predecessor(s) in the Eastern District of Arkansas. Therefore, we do not think they should have formed a basis for a particular trustee's removal.

18

decision to remove Ms. Goldman on any ground supported by the record.[23]  We conclude, discussed more fully below, that the record reveals two such bases for removal, namely the false testimony and the conflict of interest, as to both of which the Morgan judge had provided Ms. Goldman with adequate notice.

### D.  Opportunity for Hearing

In addition to notice, Ms. Goldman was entitled to an appropriate hearing under the circumstances.  Due process requires that the hearing provided be a fair one.[24]  The NACTT, as *amicus*, argues that because it was the Court, and not the U.S. Trustee or a creditor, which initiated the proceeding, the Court acted as both prosecutor and adjudicator and thereby violated Ms. Goldman's due process right to a fair hearing. We disagree.  The Morgan judge had ample reason to remove Ms. Goldman based on events that occurred as matters of record in the Morgan case.  It was those matters which formed the basis for the Morgan judge's Orders to Show Cause.  The purpose of the notice and hearing in that case was to provide Ms. Goldman with an opportunity to convince the Morgan judge that those matters (the events which occurred in the presence of the Morgan judge) should not have formed the basis for her removal. Thus, the Morgan judge did not act as prosecutor in his case; he simply determined that a basis existed for finding that Ms. Goldman had acted inappropriately in the case before him and gave her the opportunity to prove otherwise.  The fact that the U.S. Trustee did not take any action to have Ms. Goldman removed did not relieve the Morgan judge of his obligation to do so, based on actions taken by her in the Morgan

---

[23]  *Rodgers v. U.S. Bank*, 417 F.3d 845, 853 n. 6 (8th Cir. 2005) (an appellate court "may affirm a district court's order . . . on any basis supported by the record, even if that ground was not considered by the district court.").  *See also In re Law*, 336 B.R. 780 (B.A.P. 8th Cir. 2006).

[24]  *Clark v. Kansas City Missouri School Dist.*, 375 F.3d 698 (8th Cir. 2004) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.") (citations and internal quotemarks omitted).

case.  We therefore find that the proceeding in the Morgan case complied with § 324 and Ms. Goldman's due process rights.

### E.  The False Testimony as a Basis for Removal

The question of whether a trustee's false testimony constitutes "cause" for removal is a matter we review *de novo*, and we agree with the Morgan judge that such false testimony would be cause.  The question of whether Ms. Goldman actually gave false testimony is a question of fact we review for clear error.  "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[25]  The clearly erroneous standard does not entitle a reviewing court to reverse the trier of fact simply because it would have decided the case differently.[26] "[W]hen there are two permissible views of the evidence, we may not hold that the choice made by the trier of fact was clearly erroneous."[27]  We give even greater deference to the trier of fact when the factual findings call for an assessment of witness credibility.[28]

Generally speaking, Ms. Goldman's testimony at each of the hearings, including the Morgan judge's Order to Show Cause hearing, was unclear and was sometimes evasive and contradictory.  Although a complete review of each of the transcripts is necessary in order to get the entire picture, certain exchanges highlight the evasive nature of her testimony and the contradictory statements she made.  For example, at the May 10 hearing in the adversary action, Ms. Goldman expressly

---

[25]   *In re LeMaire*, 898 F.2d 1346, 1349 (8th Cir. 1990) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)).

[26]   *Id.*

[27]   *Id.*

[28]   *Id.*

20

agreed that the e-mails to Mr. Bueker were clear that the money was to be paid to the mortgage lender:

> Q    (By Greg Niblock, attorney for the Morgans)  Okay.  But you agree that the e-mail is very clear as –
>
> A    Yes.
>
> Q     – that you would disburse the money to the secureds first?
>
> A    Yes.
>
> Q    All right.  All right.  Would you agree that if the money had been first applied to the secured creditors that, number one, that would have stopped the interest on the secured debt?
>
> A    Well, the principal balance would have been paid on the secured debt at that time, yes.

She then testified that she was willing to grant Mr. Bueker's request to pay the money to the mortgage lender, if the Morgans agreed to stay in the case for 58 months, but that she neglected to make the notation in her files so as to hold the money:

> Q    But your e-mail with Mr. Bueker was that you would pay it to secured?
>
> A    As a professional courtesy, and with the meeting of the minds that the debtor intended on staying in 58 months, I was willing to grant his request.
>
> Q    Okay.  But then it didn't happen?
>
> A    Unfortunately, I didn't docket that in the docket.
>
> Q    Okay.

A     And my staff, it disbursed as it normally would pursuant to office procedure.

Later in the same hearing, the Morgan judge directly questioned Ms. Goldman about the agreement, at which point she reiterated that she had neglected to make the notation in the file, but then changed her position as to whether she had made an agreement with Mr. Bueker that she would pay the money to the mortgage lender if the Morgans would stay in for 58 months:

THE COURT:   Okay.  So what happened here is you agreed to, with Mr. Bueker, if he would give you the money you would disburse it to the secured creditor and then you didn't make that proper note or something in the docket, and the money went out contrary to your agreement?

[MS. GOLDMAN]:  Well, realize though this wasn't to get the money.

THE COURT:  Okay.  I understand.

[MS. GOLDMAN]:  I knew I was going to get the money.

THE COURT:  That's right.

[MS. GOLDMAN]:  So it was just under the terms we don't want that to be a restrictive order telling the Trustee how to disburse, so we always request that it come in and it be disbursed pursuant to the confirmed plan.

And had these e-mails not been exchanged or I had docketed it correctly I was – that would have been a professional courtesy to do that for him because the net result would have been the same, would have been the only reason why.  I rarely ever by e-mail agree to do that.

THE COURT:  And the answer to my question is, "Yes," then that's what happened?

[MS. GOLDMAN]:  Yes. Yes, that's what happened.

THE COURT:  All right.  Okay.  And then you agreed to that under the assumption that he would continue to pay the plan over the balance of the 58 months?

[MS. GOLDMAN]:  That's right.

THE COURT:  Was that ever expressly agreed to between you and Mr. Bueker –

[MS. GOLDMAN]:  Well –

THE COURT:  – as a quid pro quo that you would agree to do this if he would stay for 58 months?

[MS. GOLDMAN]:  We were having banter back and forth, and in particular I remember a telephone conversation where I said, "Why does it matter if the unsecured" –

THE COURT:  No, no.  Listen to my question.  Was that specifically agreed to that you would pay the secured claims with that money if he would stay in for 58 months?

[MS. GOLDMAN]:  No.

THE COURT:  There was no specific?

[MS. GOLDMAN]:  No.

THE COURT:  It was just discussed?

[MS. GOLDMAN]:  No. It was just discussed.

THE COURT:  Okay.  And you sort of assumed that he would do that?

[MS. GOLDMAN]:  I sort of assumed and hoped that he would –

THE COURT:  Okay.

23

[MS. GOLDMAN]:  – not –

Ms. Goldman's overall testimony at the May 10 hearing on the question of whether she had an agreement with Mr. Bueker to pay the money to the mortgage lender (*i.e.,* whether they had had a "meeting of the minds," as she phrased it) was unclear, at best. However, at this hearing, she unquestionably testified that, at a minimum, she had agreed to put a notation in her files and hold the money, pending resolution of something (although it is not clear what), but that she failed to make the notation and the money was mistakenly disbursed by her office to unsecured creditors.

Later, at the November 7 hearing on the Morgans' motion to reconsider the dismissal of their adversary action, the Morgan judge again questioned Ms. Goldman about the agreement with Mr. Bueker:

> THE COURT:  If [the Morgans'] complaint is granted, why wouldn't [unsecured creditors] receive the money?
>
> [MS. GOLDMAN]:  Well, if the complaint is granted, then I would have to get the money back from the unsecured creditors, and then there's a modification in place that prohibits me from disbursing further.
>
> So I suppose I would just need clarification ordered to only get back the money that pays off the house, I guess.
>
> THE COURT:  Oh, I see.  So if –
>
> [MS. GOLDMAN]:  But if I get it all back, I don't know if I can disburse with that confirmed plan in place.  That would be –
>
> THE COURT:  Because if a judgment against you personally for the 20,000, and you had to put that into the estate, then you'd have to disburse it pursuant to the modified plan which says: "Unsecureds get zero?"  That's what you're saying?

24

[MS. GOLDMAN]:  I guess.

THE COURT:   Okay.   I think that's right.   Because there is a modification that got confirmed that says unsecureds get no more money. So if more money flowed into the estate, it would have to go to the secured creditors pursuant to the plan?

[MS. GOLDMAN]:  I believe that's the case.

THE COURT:  That the plan is modified?

[MS. GOLDMAN]:  And that's what I was afraid of originally, which is why I required unsecured creditor money to go to unsecureds at the beginning of the case.

THE COURT:  Okay.  But now, do I understand your testimony to be that you deny that you had an – that you made an agreement with Mr. Bueker that you would distribute that 20,000 to the secured claim at the Bank of DeWitt?

[MS. GOLDMAN]:  That's correct.

THE COURT:  Did you –

[MS GOLDMAN]: I have e-mail and phone conversations with attorneys everyday about how the plans are interpreted.   And without a modification of the plan, I would disburse the money as the plan is interpreted.

THE COURT:  You don't recall those e-mails where you – where they purport to show that you agreed to do that?

MS. GOLDMAN: Yes, I recall the e-mails.  I had numerous phone conversations with him and numerous e-mails about how the money would be disbursed.  And I explained to Mr. Bueker on numerous occasions, and I testified to this in the original hearing, and that was that that's not the way I read the plan, that's not the way my office regularly disburses the money.

I suppose that if what he's saying is true, it could be interpreted that way.  But if he was arguing to me, it wouldn't make a difference because the unsecured creditors would get the benefit of the money.

The end result of my last conversation was: "Then why do you care?  What's the difference?"

But none of that – I do not send e-mails and modify plans by virtue of e-mails.  I can't do that.  I have no power to do that.

The only thing I can modify a plan, is a modification of the plan.

THE COURT: So you deny his allegation that you agreed to pay the 20,000?

[MS. GOLDMAN]:  Yes.

THE COURT:  With him?

[MS. GOLDMAN]:  Yes.

THE COURT:  Okay.

At this hearing, Ms. Goldman flatly denied that she had any agreement, whatsoever, with Mr. Bueker and testified that she had properly distributed the money to the unsecured creditors.  The Morgan judge found this testimony to be false because she had previously testified, and the e-mails substantiated, that she had made at least some agreement with Mr. Bueker.  At the Morgan judge's January 19, 2007 hearing on his Orders to Show Cause, Ms. Goldman attempted to reconcile her contradictory testimony by saying that she meant to say in November that she had not reached a *final* agreement with Mr. Bueker.  The Morgan judge found this explanation to be contrived and after-the-fact.

We cannot say that we have a definite and firm conviction that these findings by the Morgan judge were erroneous. As the Morgan judge found, her testimony at the November 7 hearing was unwavering that she had had no agreement with Mr. Bueker, but she had previously testified that she did have an agreement with him, even if it was just to make a notation in her file to hold the money pending resolution of the issue. At best, her testimony was evasive and contradictory, and she certainly lacked candor with the Morgan judge.[29] This, we conclude, constitutes cause for her removal.

## F. The Conflict of Interest as a Basis for Removal

As stated, causes for removal of a trustee include situations in which the trustee is disinterested or holds an interest adverse to the estate, or in which a trustee breaches her fiduciary duty to creditors.[30] Here, once the Morgans sued Ms. Goldman in her personal capacity, she was obligated to determine whether she at that point had a conflict of interest. Clearly she did, since she proposed a settlement which would have relieved her of personal liability at the expense of the unsecured creditors.

We recognize that meritless suits are sometimes brought against trustees and we do not mean to say that the simple filing of a lawsuit against a trustee means that that trustee should resign or be removed. But, once it appears that such a lawsuit against a trustee has merit, the trustee has a duty to take steps to protect creditors and avoid self-preserving decisions in the case. Resignation from the case, or hiring independent counsel to defend the trustee, may be appropriate. In this case, the Morgans' suit against Ms. Goldman was obviously not a meritless action, since Ms. Goldman herself proposed a settlement which gave the Morgans virtually everything they sought. Prior

---

[29]  See Ark. Rule of Prof. Conduct 3.3 (regarding candor to the tribunal).

[30]  *See In re Waller*, 331 B.R. at 493 (involving motion of debtors to remove trustee in their Chapter 13 case) (quoting 3 Collier on Bankruptcy ¶ 324.02 (15th ed. rev. 2004)).

to proposing that settlement, which was in her own best interest, and not in the interest of unsecured creditors, she should have resigned from the case or asked the Morgan judge to allow her to hire independent counsel. Failing to do so, and continuing to act as trustee in the case despite her conflict of interest, constitutes cause for her dismissal.

## V. CONCLUSION

There are many troubling aspects to this case. The plan proposed by the Morgans and confirmed by the Court was far from clear as to how the personal injury proceeds were to be handled. When the personal injury case was settled, the Morgans' attorney sought to make a side agreement with Ms. Goldman as to how to interpret contradictory language in the plan, rather than asking the Court to do so. The Morgans themselves misrepresented what they were going to do with the funds to be refunded to them. The United States Trustee, which is charged with supervision of the trustee system, failed to take steps to remove Ms. Goldman from the case when it was apparent that she had a clear conflict with the interests of the unsecured creditors. But the central problem here is that Ms. Goldman did represent to Mr. Bueker that she would use the proceeds to pay off the Morgans' home mortgage, but failed to do so. At the May 10, 2006 hearing, Ms. Goldman honestly admitted that she did not take steps to inform her staff that these proceeds should not be paid to unsecured creditors. There would have been no reason for her to have needed to make the notation in the file, or inform her staff, if she had not had some agreement with Mr. Bueker. While she did admit her error at that time, she did not offer to accept responsibility for the damage that error caused the Morgans, who have since lost their home. Instead, at a later hearing she changed her position and denied having any agreement with Mr. Bueker. Ms. Goldman was obligated to distribute the funds to unsecured creditors, she testified, because that is what the confirmed plan provided. Yet, in the meantime, she had asked the Court to approve a settlement under which she would have been authorized to get those funds back from the unsecured creditors, leaving them with no recovery at all under the plan. The settlement she had proposed was thus directly

28

contrary to her own interpretation of the plan. Her actions throughout were motivated by her desire to protect herself from having to make good for her error, and not to protect the integrity of the Chapter 13 process. Accordingly, the Morgan judge's decision to remove her as trustee was not an abuse of discretion.

For the reasons stated, the Order of the Morgan judge is AFFIRMED, and the Order of the Dedmon judge is REVERSED.

KRESSEL, Chief Judge, concurring in part and dissenting in part.

I join in the majority[31] opinion with the exception of Part C1, from which I dissent. As the majority indicates, there is no requirement of a request of a party in interest before the court can remove a trustee. I take that omission to be intentional and relevant. Numerous provisions of the Bankruptcy Code require both the request of a party in interest and notice and a hearing. Many require notice and a hearing, but no request of a party in interest and a few require neither. By carefully using those phrases, Congress signaled its grant of authority to bankruptcy judges to remove trustees *sua sponte*. Regarding the phrase "after notice and a hearing" Congress tells us that that requires "such notice as is appropriate in the particular circumstances, and such opportunity for hearing as is appropriate in the particular circumstances . . . ." The Supreme Court has not promulgated any specific rules dealing with the removal of a trustee, so judges who wish to proceed *sua sponte* are left somewhat to their own devices. The judges in these two cases chose to proceed by order to show cause, but there is no rule that requires that. The statute only requires the trustee receive such notice as is appropriate in the particular circumstances. Under the circumstances,

---

[31] I refer to Judge Federman's opinion as the majority opinion. In his opinion, Judge Federman speaks for me and for himself in affirming the order entered in the *Morgan* case. Judge Federman speaks for Judge Mahoney and himself in reversing the order in the *Dedmon* case. Simple arithmetic indicates that that opinion represents the judgment of the court as to both appeals.

because of the long history of the proceedings in the *Morgan* case, the earlier, albeit by a day, entry of the order to show cause in the *Morgan* case and the reference in the *Dedmon* order to show cause to the *Morgan* order and case all would lead me to conclude that notice was appropriate under the circumstances.   Certainly Goldman knew that it was her conduct in the *Morgan* case that led the judge in the *Dedmon* case to issue his order to show cause.  It was, in fact, her conduct in the *Morgan* case which lead the *Dedmon* judge to remove her.

I think the majority is being entirely too punctilious in concluding that the notice in the *Dedmon* case was insufficient.  I would affirm both orders.

MAHONEY, Bankruptcy Judge, concurring in part and dissenting in part.

I concur in the decision of the majority to reverse the order in the Dedmon case, but not only for the reasons stated by the majority.  I will explain further in my dissent.

I dissent from the reasoning and conclusion of the majority with regard to the Morgan order.

The standard of review with regard to findings of fact is clear error.  I cannot say that the Morgan judge's findings that Goldman's testimony at the May hearing and November hearings was inconsistent and that she had a conflict of interest with the unsecured creditors when she attempted to settle the Morgan lawsuit by pursuing repayment from the unsecured creditors are clearly erroneous.  However, I believe that under the circumstances of these cases the judges abused their discretion and I write in dissent because I believe the process was fatally flawed and totally unfair to Goldman.

The majority may be correct that 11 U.S.C. § 324(a) can be invoked by a bankruptcy judge without a third-party motion to create a contested matter, but I doubt

it.  The majority cites no cases in which the bankruptcy judge sua sponte removed a trustee under § 324 without a motion by the U.S. Trustee, a creditor or a debtor.  See, e.g., Richman v. Straley, 48 F.3d 1139, 1144 (10th Cir. 1995) (congressional intent in giving U.S. trustee, rather than court, authority to appoint and remove standing trustees was to free courts from administrative role in order to better perform judicial functions); Dye v. Brown (In re AFI Holding, Inc.), 355 B.R. 139 (B.A.P. 9th Cir. 2006) (debtors' investors moved for removal of Ch. 7 trustee); Miller v. Miller (In re Miller), 302 B.R. 705 (B.A.P. 10th Cir. 2003) (debtor moved for removal of Ch. 7 trustee); U.S. Trustee v. Repp (In re Sheehan), 185 B.R. 819 (Bankr. D. Ariz. 1995) (U.S. trustee moved for removal of Ch. 7 trustee); In re Drinkwater, 178 B.R. 590 (Bankr. D. Mass. 1995) (U.S. trustee moved for removal of standing Ch. 13 trustee); In re Lundborg, 110 B.R. 106 (Bankr. D. Conn. 1990) (debtor and creditor both moved for Ch. 7 trustee's removal). The majority, on page 14, correctly states that "[W]hen a party moves for removal of a trustee, the movant bears the burden of establishing cause by setting forth specific facts which support such removal."  That language is taken directly from a decision of a panel of this very court, Alexander v. Jensen-Carter (In re Alexander), 289 B.R. 711, 714 (B.A.P. 8th Cir. 2003).

The word "movant", as used in the law, means "one who makes a motion to the court." The Dictionary of Modern Legal Usage 575 (2d ed. 1995); Black's Law Dictionary 1035 (7th ed. 1999).  The word itself contemplates a third party making a motion to the court.  In these cases, the bankruptcy judges each made their own motion to the court, a procedure not recognized by rule or statute. Even so, each judge then shifted the burden of proof away from the movant and onto the trustee.  In section IV.D., "Opportunity for Hearing," of the majority opinion, it clearly states that the Morgan judge shifted the burden of proof to Ms. Goldman on the issue of her removal for cause. Slip op. at 19 ("Thus, the Morgan Judge did not act as prosecutor in his case; he simply determined that a basis existed for finding that Ms. Goldman had acted inappropriately in the case before it and gave her the opportunity to prove otherwise.") (emphasis mine). That burden-shifting is also made clear by the language of the show-

31

cause orders.  In each order, the judge directed Ms. Goldman to show cause why she should not be removed.  According to our own jurisprudence, as shown by the Alexander decision, such burden-shifting is impermissible.

Both judges were understandably concerned about the inconsistent testimony of Ms. Goldman.  Because the inconsistent testimony was given under oath in the bankruptcy court in the Morgan case, the judge in the Morgan case had a legitimate basis for taking some action.  However, rather than becoming the "movant" as well as the trier of fact, other, fair procedures could have been followed.  For example, the Office of the United States trustee could have been requested to investigate the matter and make a report and recommendation to the court.  After all, it is the statutory duty of the United States trustee to appoint and supervise Chapter 13 standing trustees.  28 U.S.C. § 586(b) and (d).  Alternatively, because Ms. Goldman is an attorney, the state bar disciplinary proceedings or the local federal district court attorney disciplinary proceedings could have been instituted by a referral from the judge.  There are probably many other procedures that a judge concerned about the activities or testimony of a trustee could take to assure fairness to the trustee and yet protect the integrity of the court and the legal process.

Because I firmly believe that the process itself was tainted in both the Morgan and Dedmon cases, I would reverse both orders.

———————————————